I'll call the next case. We're back on the record. Shonhai v. Attorney General No. 25-1931. Good morning, Your Honors. Thank you for having argument today. I'm Stephen Fogdal on behalf of Petitioner Kudzai Shonhai. I'm going to ask for three minutes for rebuttal. That'll be grand. Thank you. I want to say congratulations to the bar members. That was a nice ceremony that you did. So I want to start, if I could, with being very clear about the relief that we're seeking in this petition. Obviously, we've urged the court to hold that Mr. Shonhai is not removable as charged in the notice to appear. And we've asked that you direct that the removal proceedings be terminated. That necessarily means that the later rulings in the case have to be vacated as well. I mean, we've said that Your Honors don't need to reach those issues, but necessarily they need to be vacated. If the immigration judge had terminated removal proceedings in April of 2023, as it should have done, then none of the rulings after that point would have been reached and that they have to be nullities and they have to be vacated. So the relief we're seeking necessarily includes that. I just want that to be clear. So before getting to the removability piece, there is a venue question. I don't think we need to reach it. The government doesn't object to proceeding in this circuit. I think that you both agree that, and your friend can tell me otherwise, but I think you both agree it's okay here. I guess, and maybe it's an academic point, but what law do we apply? Do we apply 4th Circuit law or 3rd Circuit law? I mean, the government's taking the position it's 3rd Circuit law. We're happy to go along with that. The government actually did argue before the IJ in opposing the motion to terminate. That 3rd Circuit law applies. So we're fine with your circuit, applying your circuit. So, yeah, I don't think venue or choice of law is going to be an issue in the case. Let me ask you about the big issue, as I see it in this case, is the Indiana conviction. How is that not a crime involving moral turpitude? Well, it's not a crime involving moral turpitude because the statute is clear that it's a strict liability offense as to the compulsion element. The age of the victim is not an element of that offense. He was charged with sexual misconduct with a minor, but he wasn't convicted of that. He was only convicted of sexual battery, and that offense applies regardless of age. It applies to adults. So the least culpable conduct hypothetically necessary to sustain a conviction would be touching an adult where the perpetrator has no idea whatsoever that the victim feels compelled to submit to the touching by force. And under this circuit's decisions and under BIA decisions, if the mens rea is less than recklessness, so if it's negligence, or if it's strict liability, it's not a crime involving moral turpitude. Now, the one exception to that is where the crime is a sex crime and the age of the victim is explicitly an element in the case. And you can see that in Maboub, this court's decision in Maboub, and in the BIA's decision in Jimenez-Cedillo, this court said in Maboub that strict liability morality offenses like indecent assault under 3126A8, which involves the age of the element, the age of the victim as an element, the victim has to be 16 or under, these statutes are enacted for the protection of the child and are inherently antisocial and depraved. But the key there is that the statute is enacted for the protection of the child, so it includes the age of the victim as an element. This statute in Indiana, the sexual battery statute, does not. Similarly, in Maboub-Jimenez-Cedillo, which is a BIA decision, so the petitioner there argued that he couldn't be removed because he didn't have intent. And the BIA says sexual crimes involving young children have historically been accepted from the requirement of intent because the intent to achieve the immoral result is inherent in the willful commission of such an act. So that's a narrow exception to the general rule that this court has recognized and that the BIA has recognized that where the statute is a strict liability statute or a negligence statute, it's not a crime involving moral turpitude. Now, that was a Did I speak? Did I address it? Yeah, I think so. Do we owe deference to the BIA's determination that the convictions are CMITs? No, no. I mean, we're in a post-Chevron world, and at least as to the Indiana statute, it's a question of state law. It's not a question that the BIA has expertise in. This court is just as able as the BIA to construe Indiana state law. So no, you do not. Your friends on the other side say, with respect to intent, we should focus on the statute, which says you have to have the intent to arouse. And then they say we should look to Indiana state law, specifically the Scott Gordon v. State case that explains, looking at this statute, that only those touchings which are knowingly or intentionally performed in a rude or angry manner violate the statute. They say that's sufficient intent. Why is that wrong? Well, the rude or violent language actually relates to battery, not sexual battery. That language is not part of the sexual battery statute. So with sexual battery statute, the only act that's required is a touching for the purpose of arousing sexual desire. That's what's required under the sexual battery statute. And that alone is not inherently turpitudinous. And that's what the Second Circuit in F. Stathiatis says. Sexual gratification alone isn't evil. Now, in the specific context of a crime where the age of the child is an element, courts and the BIA recognize that in that specific context, even though there's strict liability as to age, it's still turpitudinous. But that's a very narrow exception. We took a look at the definition of CIMT in the context of immigration cases in No Duke versus the Attorney General. And there we wrote that it's a two-element standard, consistent of an actus reus and a mens rea. And we define the actus rea as the crime must involve reprehensible conduct, meaning an act that is inherently base, vile, or depraved, contrary to the accepted rules of morality and the duties owed to other Well, I mean, you've got to break that down into there's got to be a culpable mental state and a reprehensible act. And the two have to fit together. The culpable mental state has to encompass the reprehensible act. What is reprehensible about the crime has got to be encompassed by the mens rea. And where the mens rea is simply an intentional touching to arouse sexual desire, that itself doesn't, what's reprehensible is supposedly that the victim is compelled or feels compelled or perceives that they're compelled to submit to the touching by force. But the mens rea doesn't encompass that part of the crime. That's clear. It's strict liability as to that crime. It's a purely subjective test that the victim feels compelled. But just to follow up on Judge Restrepo's question, in the Ndungo case, didn't it suggest that if any specific intent mens rea, regardless of whether reprehensibility is enough to constitute a CMIT? That's a loose gloss and a very incomplete description of the court's law in this area. And it's dicta. Ultimately, what the court concluded is that the crime there was not a CIMT. So that's, I don't read that language in Ndungo as literally saying that as long as there's intent as to some part of the crime, as long as there's specific intent as to some part, even if it's not the part that's supposed to be reprehensible, it's a part that could be completely innocent. I don't read Ndungo as saying that therefore that qualifies as a CIMT. I mean, that's just, that just goes far beyond what was actually at issue in Ndungo. And it just, it didn't play a role in the court's ultimate decision. So it's at best dicta. Let's assume we get beyond CIMT. Let's assume you convince us that this doesn't qualify. What do we do about, is this a particularly serious crime? So again, I mean, the, our position is that if you hold that Mr. Shunhai is not removable as charged in the NTA, that ends the case. So you don't need to get there. So on the particularly serious crime aspect, that is, it's, so there's sort of two stages to that. The first stage is the ambit analysis where you ask whether the element, just looking at the elements of the crime, whether they fall within the particularly serious crime. And then if the answer to that is yes, then you can look at the actual facts. So that first stage, that ambit analysis is really just very similar to a categorical analysis where you're just looking at the element. And here, I think if you say that a touching of an adult human being where unbeknownst to the actor, the person being touched feels compelled to submit to the touching by force, but the actor is innocent as to that, that's what's required to convict under the statute. And I don't think you can say it's a particularly serious crime either. And I think this, although I do think that, you know, I've said you don't need to reach these other issues, if you are going to go there and get to, you know, the PSC issue and the termination of Mr. Shunhai's asylum status, I think you really have to, I mean, there's a big hole in what the IJ did here and what the BIA did here was just to say that it was a PSC and then just revoke his asylum status without any sort of discretionary analysis and in particular without ever addressing whether he has a reasonable fear, a well-founded fear of persecution upon return to Zimbabwe. I think at a minimum, that had to be addressed before his asylum status was terminated. And I recognize I don't have authority that I can point you to for that because to my knowledge, there is no decision in this circuit or another circuit that I've been able to find that defines the standard that governs revocation or termination of asylum status. It's a big hole in the law. So if you are going to reach that issue, I urge you to hold that at a minimum, that standard that governs termination of asylum has to include some consideration of whether there is a well-founded fear of persecution. And that's never occurred in this case despite significant evidence, especially on remand. I'm out of time. I'm sorry. Especially on remand, the significant evidence that Mr. Shonhai was able to supply such that the immigration judge said, the objective evidence shows that it's a dangerous place to be an opponent of the ruling party in Zimbabwe. That's significant evidence that should have been taken into account. And his asylum status should not have been terminated without doing that. I'll sit down. We can have you back for your rebuttals. Thank you so much. Thank you. Thank you. Okay. And we'll hear from the government.  Please support Brantley Mayors for the Attorney General. This court should deny in part and disembark petitioner's request for review because Indiana's sexual battery statute is categorically one alterpitude. Petitioner is removal twice over and petitioner is not entitled to any relief from removal. I will start with the question of. Maybe you start with what law we apply. Yes, Your Honor. So we use third circuit law in our briefing. We agree that's appropriate here. We also are not contesting venue at this time. Okay. Great. Third circuit law is good with us. We think we went under third circuit law, so we're happy to argue it and apply it. Great. So I'll start with removability. It's where most of the court's questions were to my friend on the other side. As the court recognized, there's kind of a two element piece of a crime of alterpitude categorically. One, you need evil intent. And second, you need a reprehensible act or a reprehensible act and an appreciable level of consciousness or deliberation. So there's a mens rea element and there's an actus reus element. Here we think both are met cumulatively with respect to the Indiana sexual battery statute. So the Indiana courts have said there are three elements. One, the defendant with intent to arouse or satisfy his sexual desires for another. Two, knowingly touch the victim. Three, when the victim was compelled to submit to be touching by force or threat of force. So we see three mens rea related pieces of these three elements. So first, as we've discussed, there is the intent to sexually gratify oneself or another. That's a specific intent. Mens rea, which the court has said in Dugu and other cases, is sufficient. But that's not all we rely on. So there's a knowing touch, which we point to the state's jury instructions for support. This court has referred to jury instructions in the past in defining the categorical scope. And then third, I'd like to point the court to the reasonable or the compulsion element. So we agree compulsion is victim oriented. But we do think the statute requires some intentional act by the defendant to create the grounds for that compulsion. Because of the force or the threat of force? Yes, Your Honor. So the force or the threat of force we read to require some sort of intentional action on behalf of the defendant. And actually, we think that the case that the petitioner cites, Tyson v. State. So Tyson v. State is a rape case that discusses how the rape statute interacts with the gap-filling statute. The gap-filling statute in Indiana, which the court is aware, provides that unless the statute defining the offense provides otherwise, if a kind of culpability is required for the commission of an offense, it is required with respect to every material element of the prohibited conduct. So prohibited conduct is the focus. And in Tyson, the case petitioner cites, in the rape context, the Indiana court there, I believe it was the court of appeals, concluded that the prohibited conduct in the context of rape in a very similarly worded statute is sexual intercourse with a member of the opposite sex by force or imminent threat of force. So that was the prohibited conduct there in a very similarly worded statute. So we think the Indiana statute requires some sort of mental culpability with respect to that third element as well. So there's three kind of mens rea elements there. It's not just the intent to gratify. It's not just the intentional touching. There's also some intentional act that gives rise to this compulsion element. We think packaged together, those three, along with the, of course, the actus reus of knowingly touching someone in a way that they're compelled to allow for the touching, all of that cumulatively we submit is a crime of moral turpitude categorically. The easiest way to think about it on the act side is there are scores of cases from this court and the BIA and other circuit courts that say battery is not enough, assault is not enough. We agree. However, here when you pair that with the intent to sexually gratify as well as the compulsion factor, we think that whole package categorically is a crime of moral turpitude. Petitioner mentioned the F-Citus case. I don't know if I pronounced that right, from the Second Circuit. There I will note the only three elements were a sexual conduct, a specific intent to obtain gratification or degrade or humiliate, and then a lack of consent. And there the Second Circuit sent it down or certified the question to the Connecticut Supreme Court asking about lack of consent in the mens rea there. Here, the Connecticut Supreme Court said negligence was enough. So the Second Circuit ultimately said, it went back to the BIA, the Second Circuit said that's not categorically a crime of moral turpitude because there's no mens rea sufficient with respect to consent. But here we do have a mens rea sufficient with respect to the acts of use of force or the threat of force that results in compulsions. We think this case is different than that one. Petitioner also, in the BIA dissenter below, says that the touching does not need to be sexual in nature as to which area of the body that is being touched. We agree, but we still think when paired together with the specific intent to gratify oneself or another and the force element that this package, again, Mubu says we take the elements together. The BIA says we take the elements together. So we think when you pair all three and consider them as a whole, this qualifies as a crime of moral turpitude. Let's assume we disagree. Your colleague is suggesting the case would be over. You know, good to PS particularly serious crime issues. Do you agree? We haven't, of course, addressed that in our papers. However, we don't necessarily see why the termination of asylum peace would fall. We think, you know, logically that kind of precedes some of the other issues. Even perhaps, you know, obviously one can't be removed without termination of asylum. So we really think that could even be the first issue. So I don't think it's necessarily, I don't think it falls if the court concludes otherwise with respect to CIMT. We would also ask the court if the court. Before we move on, do we owe deference to the BIA's determination about whether Schoenhai's convictions do constitute CIMTs? In a post-Loper Bright world, we obviously address that in the briefing. I haven't read any cases specific to this context on that in preparing. I think we would have a more difficult case in a pre-Loper Bright world. However, even if the court concludes that it's de novo review, we still think we win. So we don't think the court has to, if it hasn't already, interact with those questions. We think de novo review, this is categorically a crime of moral turpitude. We would also ask the court in this 28J letter, petitioner says, even if the court agrees as to, agrees with them as to whether the Indiana sexual battery statute is not a crime of moral turpitude, that it should also pass on the question as to whether 1227A3D applies. The BIA didn't pass on that question. We would ask the court to remand on the 1227A3D question. The petitioner argues that it's simply a question of law. However, we think there are factual issues that should be resolved as to whether, for example, an asylee can work for HUD in this capacity or certain things that make the citizenship issue material. I'll turn next to termination of asylum. There was some discussion with my friend on the other side about the particularly serious crime determination. We would submit to the court that the IJ and BIA appropriately and properly applied the NAM two-step test, first looking at the elements and considering whether they're in the ambit of a particularly serious crime, and then second, considering whether the facts in this case result in the conclusion that there was a particularly serious crime committed. The court's well aware of the facts as to the sexual battery conviction, and we would argue that those facts with the underage victim, with the sexual nature of the touching, with the nausea that resulted in the victim and she asked him to stop and he didn't, we would submit that that factual scenario, which was found in the probable cause affidavit, qualifies as a particularly serious crime. So if the court agrees on that issue, then as to whether a particularly serious crime was committed, we think the rest of the analysis follows fairly easily. There was a issue with how the BIA described the IJ's nexus finding. We refer to in our brief as a mistaken understanding. We're not here to contest that. We think we win regardless. With respect to the asylum request. Is that harmless error or futility or what's the difference? Yes, your honor. So we would argue in the I think easiest with respect to the particularly serious crime finding is that it would be futile to return the case. Right. So particularly serious crime, as the court's aware, is a bar on an asylum application. So we would submit, given the correct, particularly serious crime determination, if this case was sent back, the petitioner would not be eligible for asylum. And the petitioner also would not be eligible for withholding of removal. The court investigator of IA a few years ago on Bonk said that particularly serious crime with respect to both asylum and withholding of removal mean the same thing. And therefore, as a matter of law, petitioner would be eligible for both asylum and withholding. So we don't think the court should sit back. Also, we would note to the court that our exhaustion argument in this case went back to the IJ after the BIA's description of the nexus. Petitioner never raised it. They argue that, you know, that went back. We would also note, Your Honor, with respect to a harmless error in the withholding of removal conclusion, that petitioner didn't even challenge the IJ's withholding of removal determination when it went up to the BIA the first time. So the petitioner clearly at that time didn't think there was an error because he didn't even raise the question, didn't even argue that the IJ erred in denying withholding of removal. So we think that is clear evidence that whether it's futility because of particularly serious crime or harmless error, that the BIA's description of the nexus finding, which is the more appropriate term here? Your Honor, with respect to particularly serious crime, we think we would suggest that futility is the right way to think about it. With respect to the failure to challenge, because it's legal, you know, he would not be legally possible for him to get relief with respect to asylum and withholding of removal if this court agrees that, which is true, that the NAM test was properly applied to find a particularly serious crime in this case. So it's futility in both cases, you think? Yes, Your Honor. So with respect to both asylum and withholding of removal, we think it's futile to send it back given that the particularly serious crime definition is the same with respect to both, which this court en bas concluded. And then with respect to the failure to preserve, I suppose, or challenge the withholding of removal the first time. So, you know, IJ denies withholding. The petitioner takes up the BIA and he didn't challenge the withholding denial. So we would think that's probably categorized as harmless error. We think we win either way. So whichever way the court would like to take it doctrinally, we just ask them to take one of the two. I will move quickly to the Catt claim on substantial evidence review. We don't think the BIA's conclusion is wrong or either satisfies or the petitioner's, excuse me, arguments satisfy what it takes for substantial evidence review to result in the court granting relief. So the petitioner points to general evidence in Zimbabwe, certain instances of torture. But this court's cases make clear that this generalized evidence as to the conditions of a country do not satisfy the test required, or show that the specific individual in front of the court is more than likely to be tortured. To juxtapose, I'll point the court to the Harrow case, which petitioner relies on. There, there was specific evidence in the record that more returnees than not to Somalia were tortured in a certain time span. This led the court in that case to conclude that the Catt standard was satisfied. It remanded, or I'm sorry, the IJ should have considered that evidence. And so remanded on that basis of the Catt is possible. Here, there's no evidence of that sort in the record. So we don't think that petitioner wins on that argument either. Finally, Your Honor, briefly, I'll turn to the adjustment of status argument. Do you have jurisdiction over that? Your Honor, you do not. That is the dismissed part of my denying part. We would submit that the 1252A2B Romanette II bar would apply. I'll point the court to the Fourth Circuit case. I know there was some discussion of the Fourth Circuit precedent last time. But there is a Fourth Circuit case, Chebon v. Jadu, where the court there concluded two years ago that the Romanette II bar applies to withholding terminations under 1159. Their argument as to why this court does have jurisdiction is that the legal standard was applied, or the wrong legal standard was applied. There was no legal standard applied. Your Honor, the record squarely refutes that. Both the IJ and the BIA cited the right standard. They both applied it faithfully, and they just reached a decision petitioner disagrees with. Briefly, the standard is where adverse factors are present in a given application. It may be necessary for the applicant to offset these by showing unusual or even outstanding equities. Generally, favorable factors such as family ties, hardship, length of residence in the United States, et cetera, will be considered as counterfeiting factors meriting favorable exercise and administrative discretion. And it goes on to say, in the absence of such factors, of adverse factors, adjustment will be ordinarily granted still as a matter of discretion. So that standard bakes in discretion for the IJ to apply. The IJ properly applied that standard here. So we don't think that, you know, the petitioner's argument provides a basis for this court to have jurisdiction in that determination. All right, thank you, counsel. Thank you, Your Honor. And we'll hear from your adversary. Thank you, Your Honors. I've got a list of things I want to say. I may have to ask for your indulgence. First, just we didn't get to it in the opening argument, but there is the further issue of removability under 1227A3D, which is the false representation of citizenship. So we would urge you to reach that issue rather than remand. We argued in the brief that you can remand. The BIA didn't consider it, though, right? The IJ, the BIA did not, but a couple weeks ago I submitted a 28-J letter citing Buramindi, which is similar in posture where even though the BIA didn't reach the legal issue, this court said that it could reach the issue rather than remand to the BIA. So we rely on that case as authority for you that you can reach the issue, and we'd urge you to do that. I want to just, Judge Montgomery-Reeves, you asked about force or the threat of force. So, again, there's no evidence in the case law interpreting the statute that there's a mens rea as to either force or threat of force. In Tyson, footnote 19 of Tyson and counsel referenced it. You know, the court drew a distinction between elements of the conduct and then attendant circumstances, and the court's very clear that culpability is not required for attendant circumstances, and force or the threat of force is an attendant circumstance. So there's not any mental culpability as to that element. So that's Tyson footnote 19. This is 619 Northeast 2nd 276. On the question of the effect of termination on, for example, the asylum status, when the parties were litigating this case before the IJ, litigating the motion to terminate before the IJ, both parties treated that motion as if it would be dispositive of the case if it was granted. If you look at the opposition to the motion to terminate, this is an appendix. This is the DHS's opposition. This is appendix 1100 to 1107. The DHS solely argued that the convictions were CIMTs and that Mr. Shanghai was removable based on the false representation of citizenship. The DHS did not say that the case should not be terminated because they have an outstanding question about asylum that needed to be adjudicated or something like that, or that their application to terminate asylum should be adjudicated. So, again, this motion should be dispositive of the case. Now, it can be dealt with at a later time whether there's some ability to renew that application that terminates his asylum status and whether there's some sort of preclusive effect. That's not for you guys, not for this court to decide. Did that make sense? I hope it did. I'm sorry. I'm trying to speak quickly because I don't have a lot of time. So, look, with respect to the question of whether a remand would be futile or, you know, Mr. Shanghai should have a chance to have that claim adjudicated on the basis of the fuller record that existed at remand. So, the BIA remanded the case and allowed Mr. Shanghai to greatly augment the record to show hardship upon removal to Zimbabwe. All of that evidence is relevant to the CAT claim. And if the CAT claim had been before the immigration judge on remand, there's a decent chance the outcome would have been different. And I do believe that Harrow was a similar case. Harrow was just like Mr. Shanghai. The petitioner came to the country as a young man. Obviously, during his time in the United States, he wasn't targeted by anyone in his home country of Somalia. But the evidence indicated that upon return, he could be. And that's the same situation here. The evidence of the conditions in Zimbabwe are that it's horrendous. There's well-documented arbitrary killings, dramatic human rights violations. And even the IJ said that it's a dangerous place to be an opponent of the ruling party, which Mr. Shanghai would be. All right. I think I've addressed everything. I appreciate your time. Thank you so much.  Thank you. Thank you. We will take this case under advisement. We thank counsel for their excellent arguments and briefing. And in particular, we'd like to thank Mr. Fogdahl and Dilworth Paxton for taking this matter on pro bono. We'll take a short recess. If counsel's amenable, we'd like to greet you at sidebar.